263 So.2d 333

**SOUTHERN PACIFIC TRANSPORTATION COMPANY, Plaintiff-Appellant,**

**v.**

**LOUISIANA PUBLIC SERVICE COMMIS-SION, Defendant-Appellee (Police Jury of the Parish of Lafayette, Intervenor-Appellee).**

No. 51808.

June 5, 1972.

Rehearing Denied June 29, 1972.

Chaffe, McCall, Phillips, Toler & Sarpy, Harry McCall, Jr., New Orleans, for plaintiff-appellant.

Joseph H. Kavanaugh, Baton Rouge, William E. Logan, Jr., Lafayette, for defendant-appellee.

TATE, Justice.

These proceedings involve the judicial review of an order of the Louisiana Public Service Commission.

The plaintiff railroad ("Southern Pacific") sues to annul an order which required it to permit construction of a crossing of a highway over its tracks. The district court affirmed the Commission's order, and Southern Pacific appeals directly to this Court. Louisiana Constitution, Article 7, Section 10(3).

The City of Lafayette and the Lafayette Parish Police Jury had initiated the proceedings before the Commission. They alleged that Southern Pacific had refused their request to permit a crossing over its tracks for a road these governmental units intended to construct. See La.R.S. 45:841–45:844.

The Commission then ordered the railroad to show cause why it should not be required to permit a new crossing over its tracks. After a hearing and pursuant to findings, the Commission ordered Southern Pacific to permit the construction of a railroad crossing at the site proposed by the governmental bodies.

Southern Pacific complains that the location of the crossing approved by the Commission is not as "suitable and convenient," La.R.S. 45:841, as an alternative location proposed by the railroad some 1000 feet further west. The railroad complains that the site selected by the local governments for the new road was based only upon the lower cost of road construction, since rights of way were for the most part donated. The railroad contends that this is an improper basis for selection of the location for a highway crossing of a railroad.[1]

---

1. As we shall note later, by this argument the railroad is essentially contending that the local governments should build their proposed new road at another location than they now plan, so that the railroad crossing thereby necessitated would be at a more convenient location. The issue, however, is really only whether the railroad is required to permit a crossing of its tracks for a new road as located and laid out according to the legislative judgment of the local governments concerned.

The issue here concerns the application of La.R.S. 45:841. This enactment provides: "The Louisiana Public Service Commission shall require the owner, possessor or operator of any railway, railroad * * crossing any public road already constructed or which may be constructed, to construct and maintain a *suitable and convenient* crossing over such public road, the crossing to extend to the limits of the right of way, or fifty feet from the center of such railway, railroad * * * in accordance with the standard specifications furnished by the department of highways in respect to such crossings." (Italics ours.)

The evidence before the Commission shows: There is a public necessity for an access route from an Interstate Highway exchange to a built-up area of Lafayette, and this must cross the Southern Pacific tracks. This is conceded by all parties. Such an access route will eventually form part of a "Metro-Loop" to provide easy access around and into the settled areas of Lafayette.

In connection with this need, and with the proposed Metro-Loop, the Lafayette Regional Planning Commission (the official planning agency for the city and parish of Lafayette) has recommended the road-location and railroad crossing now proposed by the Lafayette Parish Police Jury and the City of Lafayette. See La.R.S. 33:106. They did so, further, by deliberate choice of it over the alternative route proposed by

Southern Pacific. After study and recommendation of its metro-loop committee, the Lafayette Parish Police Jury concurs in this recommendation. So does the City of Lafayette. Rights of ways have been secured from land owners along this route, and the Police Jury has graded part of the roadway and has placed culverts along it.

The route was selected by the local governments not only because rights of way can and have been secured (without cost) through it. A further reason for their choice is that this location passes through raw and undeveloped land, whereas the alternative route passes through commercially and industrially developed property. To construct the new road through the alternative route advanced by the railroad would involve the relocation and disruption of established businesses, as well as the greater cost of land-acquisition and delay of expropriating from unwilling owners.

The Louisiana Department of Highways, per an opinion in the record relied upon by the Commission, also approved the location of the access route planned by the local authorities and urged its construction as needed, with the highest possible priority. The highway department commented that the alternative road-location recommended by the railroad crosses a drainage area which would increase construction problems and costs.

The uncontradicted testimony of the government officials concerned was that no

funds are available to acquire the road bed along the route proposed by the railroad. The uncontradicted estimate is that it would take at least six or seven years before the access road, concededly necessary *now*, could be constructed at the location proposed by the railroad.

The road proposed by the local governments will cross the railroad's right of way some 1500 feet west of the throat of its 18-track yard. The alternative route crosses the railroad some 1000 feet further west. Both locations cross only three tracks, two tracks for through trains (i. e., one for eastbound, one for westbound), and one "storage" track (i. e., on which trains are sometimes parked or "stored").

The railroad opposes the crossing-site recommended by the local governments because its study shows that motor traffic will be obstructed an average of three hours and nine minutes per day.[2] The railroad estimated that only 45 minutes of this was due to the passage of through trains—the remainder would occur when 20-car or more freights were moved in and out of the throat of the yard in switching operations, in connection with making up trains of cars of similar destination.

The railroad contends that its alternative route, therefore, is more "suitable and con-venient," La.R.S. 45:841, since at this place the crossing would be blocked for only about forty-five minutes per day. This is the amount of time *estimated* for through trains. Being further west, the railroad suggests, its crossing would not be blocked by the switching operations conducted in its yard.

In ordering the railroad to permit construction of a crossing at the site of the new road proposed by the local governments, the Commission specifically found:

"It appears that the crossing is needed without delay, and that the location urged by the City, the Parish and the State is, for practical purposes, the only location and type of crossing which can be achieved. The rights-of-way have been obtained by donation, with a grade crossing specifically made mandatory. Funds with which to cross elsewhere or by grade separation are unavailable. The public authorities urge their proposal despite the associated disadvantages which they recognize and accept as the only way in which this needed public facility can be obtained. We find no practical alternate to the crossing sought, which we assume will be provided with the proper public safeguards, and recognizing the broad public interest to be served, we agree with that request."

---

2. This included about two hours of actual blockage by trains and an additional period when the warning gates would inhibit motor vehicle access because trains were approaching the crossing. The question-ing by the Commission indicated that this last delay—such as when the slowly backing train approached but did not enter the crossing—might be reduced.

After a review of the record, we cannot say that the decision of the Commission was plainly contrary to the facts or unsupported by evidence. Since the ruling was not arbitrary or capricious, it will not be disturbed. Under the well-settled principle, the orders of the Public Service Commission and of other administrative bodies exercising discretionary authority are accorded great weight and will not be overturned by the courts in the absence of a clear showing of abuse of power. Illinois Central R. Co. v. La. Public Service Commission, 224 La. 279, 69 So.2d 43 (1953).

The cited decision, as a matter of fact, reviewed contentions similar to those advanced by the present railroad. There, a railroad had resisted furnishing a crossing near its yard for reasons virtually identical to those here advanced. This court held that, under La.R.S. 45:841, constitutionally valid, the railroad could not deny public bodies a railway crossing for a road to be constructed, where the Commission reasonably found such crossing to be suitable and convenient.

Southern Pacific, however, contends that the order of the Commission here is founded simply upon avoiding the additional expense to the public bodies caused by building a road to the more convenient crossing-site recommended by it. The railroad relies upon Kansas City Southern Railway Company v. Louisiana Public Service Commission, 254 La. 160, 223 So.2d 132 (1969).

In that decision, this court overturned an order of the Commission which had required that railroad to furnish a crossing at a place which would traverse many tracks. We did so, however, because of the overwhelming evidence that the crossing at such a site was extremely hazardous to the traveling public and was not a suitable or convenient location. In so concluding, we also pointed out that a more suitable crossing would be at another (already constructed) street, where only one main line track would be traversed.

We did note that the fact that this alternate crossing would necessitate spending additional funds was not a valid reason for the Commission to approve a hazardous and unsuitable crossing. However, we also noted that in fact there was no showing of the difference in cost to the public body concerned.

Our *Kansas City Southern Railway* decision may indeed be authority indicating that the Commission may abuse its discretion if it orders a railroad to furnish a crossing at one of two *existing* streets, where the site approved by the Commission is found to be hazardous to the public and, therefore, not suitable, whereas a crossing at the other *existing* street would, in fact, afford a site for a "suitable and convenient" crossing, La.R.S. 45:841. The decision is not authority that the public body must build a road to the site selected by the railroad as more suitable or convenient.

If the location of the new road by the local governments were a proper concern in this proceeding of the railroad, the Commission, or the courts, we certainly could not say these local governmental authorities abused their legislative discretion in locating this new road as they propose rather than at the alternative location proposed by the railroad. The latter is more expensive, will involve the disruption of established businesses, and in fact cannot be built until some six or seven years later.

However, the issue, as we conceive it, is not that broad. The local governments have determined to build a road at a proposed location and have, in fact, commenced its construction. They have called on the railroad to permit their new road to cross its tracks, since the latter refused to grant this crossing. They are entitled to do so under La.R.S. 45:841, 842. The issue is, simply, whether the railroad is required to furnish a "suitable and convenient" crossing at the place of the new road to be built.

The location and construction of a new road are matters within the legitimate legislative and political control and determination of the units of local government. Under the present record, the choice, in fact, is between a road at the location selected by the local governmental units or no road at all. In our view, neither the plaintiff

railroad nor the Public Service Commission may consider questions relating to the necessity, expediency or propriety of establishing new streets, even when they cross railroads. Cf. 74 C.J.S. Railroads § 156, especially at page 603, citing State ex rel. Alton R. Co. v. Public Service Commission, 334 Mo. 992, 70 S.W.2d 55 (1934).

Thus, the local governments in question have reasonably determined to locate their access route at the location advanced by them. It is conceded that a crossing of the railroad is necessary to accommodate traffic using any access route to be constructed, part of the proposed Metro-Loop for the City of Lafayette.

Under La.R.S. 45:841, the Louisiana Public Service Commission "shall require" the the railroad to furnish "a suitable and convenient" crossing over such public roads. The Commission has done so, and we do not find its ruling to be an abuse of its power and discretion.

Accordingly, we affirm the judgment of the District Court affirming the order of the Commission. The plaintiff-appellant is to pay all costs of these proceedings.

Affirmed.

SUMMERS, J., concurs in the result.

BARHAM, J., concurs.